UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 21-cr-00292-RCL |
| ) | |
| CHRISTOPHER WORRELL ) | |
| ) | |
| Defendant ) | |

**DEFENDANT'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

I.      **Introduction**

Comes now Defendant Christopher Worrell, by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on August 18, 2023.

Mr. Worrell appears for sentencing before this Court having be convicted after a bench trial of all Counts alleged against him.

But, as the Court acknowledged and affirmed in the rendering if its verdict from the bench, a substantial amount of evidence offered by the Government during the more than four days it took to present its case-in-chief was largely irrelevant. As such, that evidence should not be "relevant conduct" for purposes of sentencing, and Mr. Worrell's view is that the Court should set aside and disregard that evidence – that being the copious amount of exhibits and testimony regarding the Proud Boys organization and Mr. Worrell's membership in that organization.

As the Court made clear, the evidence supporting Mr. Worrell's conviction was the evidence of his actions in and around the Lower West Front of the United States Capitol near the line of "bike rack" barricades established by law enforcement, most particularly his momentary deployment of pepper spray in the direction of the line of officers behind those barricades.

The Court found that Mr. Worrell's comments at various points in time before and after this action was evidence with respect to his state of mind, and that evidence as therefore relevant to his actions the charges against him.

But the actions and sentiments as expressed by others, whether other members of the Proud Boy group or otherwise, are irrelevant for purposes of sentencing Mr. Worrell.

## II.     The Offense Conduct

Mr. Worrell provided informal objections to the Probation Officer with regard to numerous references in the Offense Conduct Section of the PSR to co-Defendant Dan Scott and his actions. Mr. Worrell also made numerous objections to various communications between members of the Proud Boys other than Mr. Worrell, as well communications using the Telegraph messaging application where there is no evidence to support a finding that Mr. Worrell saw or adopted the comments made by others.

Mr. Worrell's counsel repeatedly elicited testimony from Government witnesses that it had no evidence that Mr. Worrell read or was aware of many of these messages, and argued in closing that most if not nearly all of this evidence as not relevant to the offenses charged in the indictment. The comments made by the Court during the issuance of its verdicts seemed to adopt this view, as the Court made reference to such evidence being largely irrelevant and based its factual findings on the evidence of what Mr. Worrell said and what Mr. Worrell did.

On that basis, Mr. Worrell requests that the Court adopt its factual findings made as part of its verdict in place of the Offense Conduct Section of the PSR which, as written, includes significant amounts of irrelevant information based on the Court's findings as part of its verdict.

Beyond the facts necessary to find Mr. Worrell guilty with respect to having been on the restricted grounds of the United States Capitol for the time period he was present.

### III.  Sentencing Guidelines Calculation

Mr. Worrell is not certain how the Probation Officer arrived at the Guideline Calculations as set forth in the PSR.  Rather than attempt to make objections and corrections to the calculations set forth, Mr. Worrell submits that the following calculations should be adopted based on the facts as found by the Court in rendering its verdicts.

The convictions on Counts 1 and 13 – for violations of 18 U.S.C. Sections 1512(c) and 111(b) respectively – result in the highest Total Offense Level pursuant to the Guidelines.  Which of the two is higher depends upon the application of various special offense characteristics set forth in the different Guideline provisions that apply to each offense.

<u>Count 1 – Obstruction of an Official Proceeding</u>:

Section 2J1.2 is the applicable Guideline provision for this offense and the Base Offense level is 14.  **14**

The PSR recommends a +8-level enhancement and a +3-level enhancement under Sections 2J1.2(b)(1)(B) and 2J1.2(b)(2), respectively.

Mr. Worrell objects to the application of both subsections for the reasons set forth in more detail below – namely that the Congressional proceedings happening on January 6, 2021, did not fall within the meaning of the phrase "administration of justice" as used in the text of both enhancements.

Because no other Special Offense Characteristics under Sec. 2J1.2 apply, the Adjusted Offense Level is 14.

Adjusted Offense Level **14**

### Count Thirteen – Assaulting an Officer with a Dangerous Weapon

Section 2B2.2 is the applicable Guideline provision with respect to Count 13, and the Base Offense Level is 14. **14**

Because Mr. Worrell has suffered a conviction under Section 111(b), two levels added. **+2**

Because the Court has determined that the pepper spray used was a "dangerous weapons", four levels are added. **+4**

Because the victim(s) were law enforcement officers as defined in Sec. 111, and the offense was motivated by their status as such as found by the Court, six levels are added pursuant to Sec. 3A1.2(b). **+6**

The Adjusted Offense Level is 26. **26**

Mr. Worrell has an out-of-date criminal history, with none of the prior episodes resulting in points for purposes of his sentencing in this case. As a result, he is in Criminal History Category I.

A Total Offense Level of 26, with a Criminal History Category of I, results in an advisory Guideline Range of 63 to 78 months.

**Objections To Proposed Guideline Enhancements**.

1. Sec. 2J1.2(b)(1)(B) and 2J1.2(b)(2) -- "Administration of Justice."

With respect to Count 1, "Corruptly Obstructing an Official Proceeding," Mr. Worrell objects to the application of these two enhancements on the basis

that the term "official proceeding" as used in the statute, and which in this case is the congressional proceeding taking place on January 6, 2021, does not fall within the meaning of the phrase "administration of justice" as that term is used to limit the application of both these guideline enhancements.

The factual basis necessary for the application of the 8-level enhancement is that the offense conduct involved causing or threatening physical injury to a person, or property damage, in order to obstruct "the administration of justice."

The phrase "administration of justice" is described in Application Note 1 to Sec. 2J1.2 as involving processes or procedures that fit within the following parameters:

> "a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."

For the +8-level enhancement to apply, the offense conduct must fall within the ambit of "administration of justice" as that phrase is used in the Guidelines.  The definition in Note 1 can be divided into three parts:

1) a felony investigation;

2) an indictment, verdict, or any other judicial determination;

3) the unnecessary expenditure of substantial governmental resources or court resources.

The first two parts of the definition fit a textual interpretation of "administration of justice" limited to a judicial or quasi-judicial tribunal determination of a criminal or civil matter that applies the force of the state to determine legal rights.  These parts refer to "investigations," "verdicts," and

"judicial determinations" – all of which involve the coercive force of the state and the actual or potential determination of legal rights in judicial or enforcement proceedings.  None of the component of the first parts can be harmonized with conduct taking place as part of a "congressional proceeding."  Congress is not involved in felony investigations, nor is it involved in "indictments," "verdicts," or "judicial determinations."

Only the third part of Note 1 provides a plausible rationale.  But close analysis shows the rationale does not hold up.

In other cases where this issue has been disputed, the Government has relied upon the final phrase involving the "unnecessary expenditure of substantial Governmental . . . resources" as the basis for a finding that "congressional proceedings" come under the umbrella of "administration of justice" because governmental resources are consumed by congressional proceedings.  But to reach this conclusion, the word "governmental" must be read as a collective reference to all three branches of the federal government.

If the word "governmental" was meant as a collective reference to the Executive, Legislative, and Judicial branches of the federal government, the inclusion of the additional reference to "court" resources in the sentence is redundant and superfluous.  Rules of statutory and regulatory construction requires that words of a statute/regulation be "associated in context" when they are used together in a sentence.

Interpreting the word "governmental" as synonymous with a reference to the Executive branch alone is consistent with the entirety of the definition, as it otherwise speaks only to Executive branch and Judicial branch functions in

investigating and adjudicating disputes in as part of the criminal and civil justice systems. That is, after all, the import of nearly the entirety of Title 18 U.S.C. Chapter 73, beginning with Sec. 1501.

If the former – if "Government" is meant as a reference to the federal government as a whole -- then the words "or court" that follows "governmental" are superfluous and without meaning to the sentence.

If the definition of "governmental" reads out the inclusion of the Judicial branch to avoid the superfluous reference to "court resources," then is no longer any rational basis to read into "governmental" an inclusion of the "Legislative branch," and the congressional proceedings on January 6 do not fall within the definition of "administration of justice,"  making the two Specific Offense Characteristics under Sec. 2J1.2 inapplicable here.

> 2. The Enhancement for Extensive Planning Under Sec. 2J1.2(b)(3)(C) Does Not Apply Under The Facts.

The PSR makes a generalized reference to Mr. Worrell being "involved in" numerous discussions with other members of the Proud Boys about the need to protest the election results. That reference provides no factual basis for a finding with regard to "planning." As the Court will no doubt recall, there was much doubt from the testimony with regard to just what messages and/or chats Mr. Worrell was actually involved in. He was a member of one Florida chapter of the Proud Boys, he was not part of the leadership of that chapter, and he had not interactions with the national leadership of the Proud Boys.

The PSR also refers to the fact that he "planned, prepared, and traveled with five to six other Proud Boy members." But the evidence at trial did not

support this claim.  Mr. Worrell testified that he traveled by vehicle with seven other individuals – four male-female couples – and only two of the other individuals were Proud Boy members.  They mostly remained together as a group – although the men and women in the group were forced to separate for the Stop the Steal Rally because the "gear" being worn by the men was not allowed through security at the rally.  So the men went separately to the nearby Washington Monument while the women attended the Rally.  The two groups then reunited on their way to the Capitol.  None of the other members of the group that Mr. Worrell traveled with were ever charged, so it cannot be said that his traveling companions were part of "offense conduct" that was extensive in scope, planning, or preparation.

  That's not to say that Mr. Worrell didn't know other individuals who traveled from Florida to Washington D.C. – he certainly did.  But the offenses for which he was convicted did not involve any planning or preparation with them to carry out the charged crimes.

  The PSR also makes reference to the equipment Mr. Worrell brought with him from Florida – a Baofeng two-way radio and antenna, pepper spray, and a "stab proof" vest.  As Mr. Worrell testified, and about which there is no factual dispute, Mr. Worrell was present in Washington D.C. at a prior march/protest were a violent encounter took place between members of the Proud Boys and members of a counter-protest group.  Several Proud Boy members were injured, and one suffered serious stab wounds.  Mr. Worrell was in close physical proximity to the individual who was stabbed.  Mr. Worrell testified that the items he brought with him from Florida were all intended for defense

purposes in the event there was a similar incident on January 6 – something that could not be ruled-out ahead of time.

It makes no different who the aggressor was in that earlier incident. Mr. Worrell was entitled to come to Washington D.C. on January 6, and he was entitled to protest in a public location. Given the prior episode, it was justifiable that he came prepared to exercise self-defense if necessary, and to wear whatever protective gear he had to assist him in that respect. The radio was to assist in communication with his traveling companions in the event they became separated in the crowd, and cellular telephone service was interrupted by the size of the crowd – something that had happened at the November rally. He testified that the radio he was wearing was tuned to a frequency that only put him in contact with the individuals he was traveling with and no one else. There was no contrary evidence offered at trial.

Finally, the PSR refers to the comment made by Mr. Worrell to members of the Metropolitan Police Department as he was walking past them on his way to the Capitol. Mr. Worrell testified to his words. To reinforce his testimony, the Court received into evidence at Tee-Shirt belonging to Mr. Worrell with the phrase "I kneel to only one man -- Jesus Christ." Mr. Worrell explained in his testimony that his reference to "on your knees" in his comments to the Officers reflected his religious beliefs and is a phrase he uses often in a variety of contexts. It did not mean, as might be mistakenly believed, that he was directing the Police Officers to kneel in front of the protesters or otherwise subjugate themselves to the wishes of the mob.

    3. **The Court Should Not Impose A Two Level Enhancement With <u>Regard to Mr. Worrell's Testimony</u>.**

The Court has had many chances over an extended period of time to develop a point of view regarding Mr. Worrell based on numerous interactions with him during the time he's been a defendant, as well as the time in trial observing Mr. Worrell and listening to his testimony.

Mr. Worrell's testimony is a matter of record, as are the Court's comments concerning his testimony that were made as part of the Court's verdict.

Under Application Note 4 to Sec. 3C1.1, an example of applicable conduct is committing perjury pertaining to the conduct that forms the basis of the offense of conviction. But Application Note 2 provides a cautionary note on the same issue:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

The video evidence showed a chaotic scene in the area where Mr. Worrell was located towards the northwest corner of the Capitol on the ground level. The police line in front of his location was shifting forwards and backwards almost constantly once the crowd began to grow in size and the police took up positions behind the bike rack barriers dividing the two groups from each other. Various types of crowd-dispersal devices were used by the Officers to break-up the crowd or cause those in front to fall back. Objects were being

thrown by the crowd into the police line, and the police were responding with various types of non-lethal munitions to subdue the protesters.

In addition, there was a substantial wind blowing in towards the building and the officers. To the extent that officers reacted to the pepper spray deployed by Mr. Worrell, that could have been the result of "overspray" or dispersal of the pepper spray by the wind carrying it in their direction.

The confusing scene over an extended period of time could have contributed to misperceptions creating inaccuracies in his testimony as reflected in the Court's comments.

### IV.   Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), the numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. Worrell's background and personal characteristics are matters of record that are well known to this Court.

1. Nature and circumstances of the offense and the history and personal characteristics of the defendant.

    a. The Nature and Circumstances of the Offense.

As many Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence to disrupt the congressional certification of the 2020 Electoral Vote.

2) a larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with the reported outcome of the 2020 Presidential election -- but with no predetermined intention to engage in violent behavior towards law enforcement or any other individuals.  Regrettably, a significant number of these individuals were drawn into committing acts of violence once on the Capitol grounds or inside the Capitol itself; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

The facts applicable to Mr. Worrell's conduct on January 6, 2021, place him in the second group.  Mr. Worrell came to Washington D.C. to attend the "Stop the Steal" rally on the Ellipse, and then joined with the crowd at the urging of speakers to travel to the Capitol to voice his frustration and unhappiness with the electoral processes and outcome.

The facts of the events between 12:50 p.m. and approximately 1:35 p.m. on January 6, 2021, are well established in the record of the case and as reflected in the Court's verdicts.  But it should not be overlooked that the worst part of Mr. Worrell's acts happened over a 2-3 second period when he depressed the trigger mechanism on the container of pepper spray.  But for that single act, it is unlikely that Mr. Worrell would have faced any charges since he did not go inside the Capitol.  At worst, he would have likely faced only misdemeanor charges relating to being on the grounds of the Capitol while it was closed to public and under the protection of the United States Secret Service.  To his credit he did not participate in Mr. Scott's attack on the police

officers at the stairs, nor did he advance to the Upper West Terrace level and make a violent entry into the Capitol through the Senate Wing doors along with other members of the Florida Proud Boys.

It should also not be forgotten that members of the Florida Proud Boys captured on video entering the Capitol building with the first protesters to do so, and already identified by the Government, have yet to even be charged with any crime.

So the question becomes what is the necessary penalty to be imposed upon Mr. Worrell for that momentary lapse in judgment?

<u>History and Personal Characteristics of Mr. Worrell</u>.

Because of the feature of Mr. Worrell's chronic medical problems, and this Court's noteworthy intervention on his behalf with officials responsible for his custodial detention when proper medical care was not being provided to him, this Court is intimately familiar with most of the personal characteristics and history of Mr. Worrell.

The PSR accurately captures most of Mr. Worrell's biographical history. He finds himself at a cross-road in life – no longer so young as to make a "new start" for himself, but with plenty of life left ahead of him if his health is stable.

Mr. Worrell's health challenges are a matter of record with this Court. In the past the Court has requested, and Mr. Worrell has provided, updates from his various care providers with regard to the status of his disease and a prognosis. As a general proposition, it seems as if the Court has been satisfied with the documentation provided.

What Mr. Worrell can report to the Court now is that his health status is stable but considered "monitor closely."  His most recent testing was negative for tumor growth.  He continues on the medications previously provided to him by his treating physicians, but an effective treatment for the lesions and itching caused by his condition has been elusive.

His medical care providers have not yet identified a definitive for his fainting spells, high blood pressure, and elevate heart rate earlier this year.

But the nature of his condition is such that future instability or deterioration in his condition is impossible to predict – and in some circumstances might not be possible to reverse.  His condition is chronic – the nature of his condition is that he will never be free of the disease.  The goal of his medical treatment is to prevent the spread of the disease that would do damage to other vital organs or systems in his body.

While Mr. Worrell recognizes that the U.S. Bureau of Prisons operates of variety of facilities with extension health care facilities, a term of incarceration will result in him losing the continuity of care he has received from his treating physicians over the course of years.  Mr. Worrell also feels compelled to again put in the public record that after he was initially detained pending trial, he was denied medical care completely, and it took nine court appearances over the course of 240 days for the necessary medical care to be given, and then only based on the direct Order of this Court was it made to happen.

Mr. Worrell has unresolved issues regarding his current health condition, and is less than confident – based on his first-hand experience – that he will receive the level of care in a Bureau of Prisons facility that he will receive if he

continues to be treated by the physicians who have been responsible for his care for years.

## DEFENDANT'S SENTENCING RECOMMENDATION

With a Total Offense Level of 26, and a Criminal History Category of I, the advisory Guideline Range is 63 to 78 months.

Defendant Christopher Worrell requests a variance in his Total Offense Level – from Level 26 down to Level 13.  This would place his Guideline Range in Zone B of the Sentencing Table (12 to 18 months).

In Zone B of the Sentencing Table, Defendant Worrell would be eligible for a sentence of probation of up to 60 months with certain conditions imposed pursuant to U.S.S.G. Sec. 5B1.2(a)(1).  Mr. Worrell requests a sentence of 60 months probation after the granting of the variance to Level 13.

Pursuant to U.S.S.G. Sec. 5B1.1(a)(2), with a guideline range in Zone B of the Sentencing Table, an authorized sentence of Probation could be imposed if one condition of Probation requires intermittent confinement, community confinement or home detention, for a term equal to at least the lower end of the guideline range.

Mr. Worrell suggests that 30 months of home detention – one-half his term of probation – would be an appropriate sentence that takes into account all the Sec. 3553(a) factors and accounts for his chronic medical condition and ongoing care needs.

Date: August 10, 2023                                             Respectfully Submitted,

<u>/s/ William L. Shipley</u>
William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*